Good morning, Your Honors. Thank you. John Tondini on behalf of International Business Machines, IBM. There are a number of issues in this case, briefed very well, I think, by both sides. I'm going to just hit a few highlights in the time that I have today, and we'll try to reserve some time during my opening period here. Mr. Tondini, if I can, first of all, let me compliment all counsel. I thought the briefing was really good in this case, and it's always great to have good counsel on both sides. The issue that I would like you to address is basically whether, under New York law, the plaintiff could pursue a claim for unjust enrichment in a breach of contract action, where it looks to me like the subject of the unjust enrichment claim is directly addressed in the contract. Yes, that's our position. I understand. That you cannot, yes. I understand. I just want to give the other side a little heads up. A heads up to that, yeah. And I think that's one of the interesting issues that makes this a fun case, frankly, to argue, which is this is sort of a fundamental premise or tenant of contract law, which is if you define your rights in a contract, you shouldn't allow, the policy of the law should not allow one of the parties to say, well, I want to add to my rights by equity, or I want to subtract from my obligations in equity. If you are going to have a contract, and in this case an extensively written, extensively negotiated, two sophisticated corporate parties writing a contract, they have a duty to spell out what they want for their rights and what they don't want for their rights. And there's three cases, because there's a lot of cases cited in the briefing, and I should apologize for that. You know, with Westlaw these days, we tend to over-research things. But there's three I want to draw your specific attention to, because in each of these three cases, like here, there is a contract. And in each of these cases, like here, the court found there was no breach of the contract. And in each of these cases, the court also said, and because of that, you cannot try to backdoor your claim through a claim of unjust enrichment. The first of those is Radio Today v. Westwood 1, 684 F. 68. And that's Southern District of New York. And I can talk about that case in a little bit, but I want to recite these others. The second one is the Second Circuit case from very recently, 2011, which is Diesel Props v. Greystone, 631 F. 3rd at 42. Second Circuit, also New York law. And the third is an unpublished Western District of New York case, 2012. It's at 2012 Westlaw, 359-7769. And it's called Document Security Systems v. Coupons.com. And I'll start there and work my way back up. So in Document Security Systems, there was a nondisclosure agreement between the two parties. And the party, who I guess had the secrets, felt that the other party had misused the secrets that were conveyed. And they sued under the nondisclosure agreement, and they also sued for unjust enrichment. You know, you used my secrets, and that was improper. And the court said, well, let's look at the nondisclosure agreement. Let's look at the NDA. No, they didn't breach the letter of the NDA. And because you have an NDA, we're not going to let the other party claim unjust enrichment. In Diesel Props v. Greystone, a case sort of factually analogous to this one, Diesel Properties, there was a certain way they had to give notice before they shipped shoes, and then Greystone would have to pay for the shoes. They didn't give the right notice when they shipped the shoes. They shipped the shoes. Greystone didn't pay. And Diesel sues to say, hey, we shipped the shoes, pay us. And the court says, well, but you didn't abide by the contract and give the proper pre-shipment notice, so they don't owe you duty to pay back under the contract. And we won't let you claim unjust enrichment because the contract exists, and it defines your duties. Yes, you shipped the shoes, but, you know, you needed to have followed the contract. So the obvious reason you see why I find that analogous. All right, if we find those points of law applicable and they say what you say they do, can we talk just a little bit about the contract at issue here in the district court's interpretation? Yes. My understanding is that 10.3.1 deals with the bare patent licenses. Correct. And as I read your brief, and I agree with Judge Tallman, all the briefing was very well done here. I would think that 10.3.1 is unambiguous in that it governs non-exclusive licensees, and that's what IBM provided and that's what Intermec paid for. And if you take your view of what the contract said, they didn't overpay, there's no unjust enrichment, and that's the end of the case essentially, correct? Correct, other than we had a counterclaim. Right. That because of the minimums that we actually would have a counterclaim for about $4 million if it was payable under 10.3.1. All right, well, just stay with me for a minute if you would. My understanding of what happened below is that, likewise, Judge Koggenhauer found the contract to be likewise unambiguous but applied a different section, which was 10.2.1, and on the basis of that conclusion sent the case to the jury and Intermec was allowed to pursue the unjust enrichment theory and got what they got. Yes. Am I right about that? Yes. So, Judge, we argued that because the rapid start agreements, and those are the set, there was like 20 of them, these rapid start license agreements, because they licensed patents, the IBM view was, well, you know, this says if you do a non-exclusive bare patent license, it's under 10.3.1, so we said that applied. And Intermec said, no, we think 10.2.1 applies. Right. And Judge Koggenhauer said, I'm going to, even though Intermec had paid under 10.3.1 for two and a half years, Judge Koggenhauer said, I read it the way Intermec reads it now, which actually isn't the way Intermec read it. Intermec said they had different reasons for why they thought 10.3.1. Well, that's all okay. Yes. Conceptually, that's right. So then Judge Koggenhauer says, no, I'm going to tell the jury it's 10.2.1. Because of that, you know, de facto or de jure, they've overpaid, therefore there must be something owed back. Yeah. Well, let's stay together. And that became the gravamen of the unjust enrichment. Let's stay together on this. And you're the lawyer and I'm the judge, and I agree with you. Right? But Judge Koggenhauer saw it a different way. And so the fact that he's a good judge and a smart judge and an experienced judge, much more so than I am, means that notwithstanding my reading of this or our reading of this, there must be some ambiguity because two jurists with reasonable views are looking at the contract provisions as being unambiguous in much different ways. Correct? Correct. And that's precisely whether it's two judges reading it that way or the fact that Intermec and IBM read it that way. I'm really saying, Mr. Tondini, and measure your answer carefully. Okay. Are you really agreeing that there's some ambiguity to the correct reading of this statute, of this contract? Well, that's the difficulty. You can answer yes or no. Yes. Well, let me pause. Yeah. Because let me try to avoid your question momentarily by saying even when it's unambiguous, New York law says you can look at course of performance, and I think that helps. I don't think so. I think New York says that you look at the course of performance through extrinsic evidence only if it is ambiguous. If it is unambiguous, you do not look to extrinsic evidence. Isn't that correct? I agree with if it's extrinsic evidence, yes. Well, what's more extrinsic evidence than the course of conduct? But they carve out course of conduct. The Time Warner case that we cite, United Fire and Casualty, those ones very specifically say. You're trying to get two bites on the apple. Yes, I am. You're trying to say 10.3.1 applies, end of story, as we just went through a minute. But if you find it's ambiguous, course of conduct applies, and we win anyway. And that's precisely what we argued to Judge Kuhnhauer, and we're happy with that until we got the summary judgment result. So it's an alternative position that is ambiguous. It's a fallback. Let's put it that way. All right. It's a fallback. So, yes, and to Judge Murphy's point, I'm aided by the fact that we get de novo review, because Judge Kuhnhauer is a good judge, but good carpenters sometimes cut the wrong way, and I think here he cut the wrong way. And we have de novo review, and we have three fine jurors here who can read these provisions as well. And, yes, IBM's argument originally was, boy, to us this seems clear enough. These are patent licenses. And contextually it made sense, too, because where Judge Kuhnhauer went. Judge Kuhnhauer saw through all this and said the purpose of the contract is to facilitate the sale of products. So, therefore, it must be 10.2.1, not 10.3.1. Yes, but although I would submit that that's a little more extrinsic as well on his part of reading into it something that's not there. You don't like the purposefulness canon of interpretation? Oh, no, I do. I do, but let me explain. You disagree with Justice Scalia, then? Well, I'm not as learned as you. I don't want to adopt a position I'm not as familiar with. I won't play with you anymore. Go ahead. I'll actually go right ahead. I'm enjoying it. Yes, thank you. But textually there's a problem with what Judge Kuhnhauer did as well, which is he says, well, if it's products, it's got to be 10.2.1 because that's a royalty based on products. But there are several inconsistencies with that. The foremost for IBM, which wants to talk a little bit about dollars and cents, is for these rapid starts there was $23 million paid to InterMEC in upfront royalties, $23 million, not on a per product basis, but just as a royalty. And if you look at how 10.2 defines what gets paid to IBM, it has to be a product sale. If you look at 10.3, it's based on royalty. So that $23 million under 10.3, IBM gets its slice of that. Under 10.2, IBM gets zero of that. And why do people pay upfronts? People pay upfronts because they either want to front load their product sales or they have had past product sales. So it doesn't make sense. There's parts of 10.3 that have to be product based. But there's a serious point here as well, isn't there? I mean, I suspect, based on my reading of the entire record, that what Judge Baez says about the district court's interpretation of the contract is correct. But our job is not to determine the intent of the lawyers and the business people who entered into the contract. Our job, as I understand it, is to look at the contract and determine what it says. And if 10.3 is unambiguous and it governs the grant of licenses and the payment of them, that's where we stop, right? That's where you would stop. Although the definition for what you're doing in the plain reading is saying this is the intent of the parties. So they are, I think, one and the same. We don't really care about the intent of the parties. We care about the expressed intent of the parties. Yes. Before you run out of time, I would also like you to address the statute of limitation claim. Yeah, the time bar argument, I think, again, is one that is a lot simpler, let's put it that way, than the contextual reading of 10.3 and 10.2, which is, and here's where we think the judge got it wrong, that New York law says a claim of unjust enrichment, which is the only one the judgment ends up being based on, accrues when there's the payment. Someone transfers money to someone else and it's not rightful that that person keep it. That's when the cause of action accrues. Well, we have a nice, clean corporate record of payments here that's in the excerpts of records that says that the last payment was made in 2006. And you have a time bar of four years and you have a complaint that's not filed until 2011. And Judge Kuhnhauer says, well, but the claim didn't accrue until they demanded back and you refuse. And that one doesn't square with when a cause of action for unjust enrichment accrues, but it also doesn't square with the contract time bar language that says that even if the claim is unknown, it expires. And so we think for both of those reasons, Judge Kuhnhauer got that wrong. That would also be subject to de novo review. Well, if we granted relief by reversing Judge Kuhnhauer's grant of summary judgment, we wouldn't have to reach the other two issues. That would be the end of the case, would it not? Well, that would revive, if it's on the contract interpretation, that revives IBM's counterclaim. You're appealing. Yes, but I'm just looking at what's in front of us right now. We don't have to address the thorny issue of contract interpretation or whether or not you can pursue a claim for unjust enrichment when the jury found no breach of contract if we conclude that the claim was not timely filed. Correct, absolutely. What happens to your $4 million counterclaim? I would have to research whether that's somehow precluded because it's a counterclaim versus a claim, but I would think it survives. Well, have you appealed the denial of your counterclaim? We've appealed the ruling that ended our counterclaim, which is Judge Kuhnhauer's summary judgment contract interpretation. And if we reverse that, we remand it to Judge Kuhnhauer to try the counterclaim under a contract interpretation. Yes. Okay. Yes, and I'll reserve the balance. Thank you. Very well. Let us hear from Intermec. Mr. Beach? May I please report, Carson Beach on behalf of Intermec. With me today are James Williams, my co-counsel from Perkins Cooley, and Paul Maltsef, in-house counsel for Intermec. I think I'd first like to address the issue that Justice Murphy was focusing on, which is the contract itself. And I'd like to call the Court's attention to what I think is a very important provision, which very much suggests that Judge Kuhnhauer was correct. And that is in Section 10.2.1. And I'll skip the beginning sentence here. Part of the sentence talks about the dates. When it says, For each fair fee-bearing product sold or otherwise transferred by UNOVA, which is the predecessor of Intermec, its affiliates or assignees licensees. And then in a paren, it says, other than licensees referred to in 10.3.1. And in 10.3.1, there are two types of licensees referred to. One is someone who has received a bare patent license, and someone who has received a license which also includes some copyright or know-how or mass works, those would be defined terms in the contract. This is part of other IBM intellectual property. Or assistance or consulting. And the assistance or consulting obviously talks about something that Intermec does. So the agreement, it seems to me, clearly sets out that there are three types of licensees. There are licenses other than the ones in 3.1, and that's the key part of that paren language in 10.2.1. And so that is how Judge Kuhnhauer, by looking at the Rapid Start licenses and realizing that these were for the facilitation of the manufacture of products, determined that they were the kind of licenses specifically referred to in 10.2.1 and were not the kind of licenses referred to in 10.3.1. Okay. And if I say to you, okay, that's an excellent argument. However, I read 10.3.1 for what it says, which deals with each bare patent license granted by Unova to a third party. Unova shall pay to IBM, the greater of, and then goes on. Which would be Intermec, we agree. Correct? Correct. Okay. Then licensees other than licensees referred to in Article 10.3.1 are outside of Intermec, and that's all there is. If I asked you that, what would your response be? No. I mean, we don't need to go further, do we? Well, we do, because the licenses and licensees in 10.2.1, they're the ones who have received a license from Intermec, and that license includes IBM technology. It could be patents or, if you read the fee-bearing product, it could be patents or know-how or copyright. That's what 10.1 fee-bearing products defines it as. So in 10.2.1, there are clearly licensees of Intermec, right, and the license includes IBM technology because 10.2.1 then obligates Intermec to make payments to IBM based upon the revenues, the sales of the licensees contemplated in 10.2.1. Mr. Feech, I was under the understanding that there was no tribal issue of fact that was undisputed that what Intermec had sold to its licensees were Bayer patent licenses, period. No. Your Honor, that matter was no, just the opposite. In fact, as a judge— Give me the record citation as to either I'd like to see the evidence that they sold more than Bayer patent licenses in Rapid Start. Okay. Rapid Start contains the grant that they received in Rapid Start, and it's in the record. I can't cite you the exact point. It's in the record that was before Judge Kuhnhauer on summary judgment, and as Judge Kuhnhauer found— No, no, no. I'm not asking that. I'll ask that in a minute. What I'm asking for you to tell me the affidavit or the declaration or the deposition or the evidence, evidence, not argument, not finding, evidence that the Rapid Start transactions by Intermec involved more than a Bayer patent license. The agreement itself provides downstream protection to customers and end users. Could I ask you that again? Give me a citation to a Rapid Start Intermec contract or license with the people that they licensed, of the 20 people that they licensed, that says that there is more than a Bayer patent license. Your Honor, there is a declaration in the record of— I'm trying to think now which Intermec employee provided that declaration, but it is a declaration that says that in each one of these patents, each one of these patents that were granted, each one of these Rapid Start licenses that was granted, non-IBM patents and non-IBM patent applications were provided, were also licensed. And if you read the Bayer patent license language in 10.3, the P is a big P and that's defined as only specific, specific IBM patents that are listed in the agreement. And the Rapid Start licenses include additional intellectual property that was not IBM and that was designed to facilitate the sale of products and the—and so therefore they were not Bayer patent licenses as defined by the agreement. And they also therefore fall into the exception of Section 3, the second type of license discussed in Section 10.3.1, which— Go back to the record. I'm very interested in the record. I know this is tedious. Your Honor, no, no. I completely appreciate it and I apologize that I can't give you— I was under the impression that it was undisputed. To confer with your client for a minute? It's in the record and it was the basis of Judge Conover's ruling that there were non-IBM patents included in the Rapid Start licenses and therefore that constituted assistance. And when you have assistance, you're no longer in the Bayer patent license provision. You're in the 10.3.2. Sure. Thank you. I was under the impression that the terms copyrightable materials, know-how, or the mask works, or associated with consulting or assistance dealt with IBM matters. That's correct. Those things were defined terms in the contract. And now you're telling me that because non-IBM patents and non-IBM applications were added in the sales in the Rapid Start program, that converted the transaction into a 10.2.1 transaction. Well, it actually converted it into a 10.3.2, which means it gets treated under the royalty provisions of 10.2.1. So now is your position, Mr. Veach, that the inclusion of non-IBM patents and non-IBM applications in the licenses from Intermec to the 20 licensees converts it from a Bayer patent license into a 10.2.1 payable and a 10.3.2? It has always been our position. Is it yes or no? Yes, Your Honor. But it has always been our position that these licenses both qualify as the type of licenses that are defined in 10.2.1, and would have whether there was Intermec IP added to them or not, because they are for the facilitation of products. It is also our position that … That was Judge Kuhnauer's purposeful interpretation of the contract. Correct. And before him we also argued, and have taken a position, that because of the inclusion of non-IBM patents and non-IBM intellectual property, Intermec was providing assistance to the licensees that took this thing out of 10.3.1. In other words, you don't even have to reach the question of whether Bayer patent license is ambiguous, because it is the rapid start license, either at 10.2.1 or 10.3.2. You interpret consulting or assistance in 10.3.1 as Intermec consulting or assistance, not IBM. No, that's correct, because Intermec, after this transaction, would have no ability to obligate IBM to provide any consulting or assistance. No, but part of the transaction, if IBM were selling Bayer patent licenses with copyrightable material, knowledge, or mask works, and consulting or assistance, they could do that. Well, they didn't. But, I mean, that's why I said at my opening that the or, in other words, this definitely contemplates where you transfer intellectual property of IBM's or Intermec provides assistance or consulting. In order, that is the reading we would advance for that provision. And that makes perfect sense, because if you think about the way this was structured, you have 10.2.1 for licenses for the manufacturer products. You have 10.3.1 with just the big P, and that would probably be for the situation like where, say, but they weren't going to sell anything to anybody else. That would be the kind of license that they would get. 10.3.2 type licenses are the ones in which it looks like somebody's going to try to develop, do R&D, try to develop products, and that sort of thing. And there's some evidence of that in some of the extrinsic evidence. But you don't think you have to go there. It clearly says it's obvious you're transferring things which would allow people to try and make it easier to make products, and you're giving them assistance in that, or you're giving them assistance in that regard, Intermec is. And then when they do develop and sell products, the royalties get paid under 10.2.1. And so the scheme actually makes a lot of sense, if you really think it through, in terms of they were trying to contemplate every kind of possibility here. And they knew they wanted to sell a lot of products because everybody thought this RFID business was going to take off. They also wanted to encourage R&D for the further development of products. And they wanted to have something out there for people who were not going to create products, weren't going to sell products, and that's that bare patent license provision. It's people who are not those, like a Walmart, who might just want to use it in its business, but wasn't going to sell it, wasn't going to go into the RFID business. They were just going to use it in their stores or in their logistics chain. So I think that's the best I can do on that point, I think. But I really would ask the Court, again, to look very carefully at the interplay of these provisions that Perrin, other than licenses referred to in 3.1, and I apologize, Your Honor, I would offer to provide the Court by letter with a copy of Mr. Tendini, the reference to the evidence, if you like. Usually, we're accustomed to people bringing the record with them and being able to unearth the portions of the record which benefit them. I apologize, Your Honor. I didn't, I mean, I frankly didn't anticipate that there would be any question about it, given that Judge Kunauer, you know, reviewed the entire record and found, and there was no, in fact, there was no dispute below. We're reviewing Judge Kunauer. I understand that. But there is no dispute. IBM has never disputed that non-IBM patents were granted in the Rapid Start license. It's never been disputed. I'll ask that of Mr. Tendini. Unjust enrichment, which obviously the Court has got some concern about. In this case, IBM took the position in the court below that the contract did not cover a repayment, a refund, or repayment of any royalties in the event that the amount of credit that Intermec had and the amount of cash it paid exceeded the amount of royalties it ultimately owed. That was the position they took below. It's in their pretrial order. They danced around a little bit at trial, but that was the position that they took. And so it was entirely appropriate for the judge to send to the jury, instruct the jury that if you don't find in the contract that the dispute between the parties was covered in the contract, you can find, you may find unjust enrichment. I guess the problem I'm having is I read the New York cases. They use some very broad language there that basically say you're precluded from equitable recovery for events arising out of the same subject matter. And that means that if this claim arises out of the administration of this contract, even though the contract may not have contemplated an overpayment, that it nonetheless is a claim that is otherwise covered by the contract. I would say that this is much more like, I would say that, first of all, the courts are uniform, that you can plead breach of contract and unjust enrichment in the alternative. They are uniform in that. The party below took the position below that the dispute between the parties, give me my money back, please, was not covered by the contract. In fact, that was one of their defenses to the breach of contract claim. I thought their claim was that it was covered by the contract and it was properly paid. Well, Your Honor, they obviously have a position that they think they should have been paid under 10.3.1. And that's what you did for four years. Right. No, they were paid only a couple of payments under a mistaken accounting department and legal department miscommunication by Intermec. And then Intermec notified them that it was paid under the wrong provision. But the contract, unfortunately, you never really know who's going to owe what to who until the end of the contract because the royalties were constantly, the sales were constantly occurring and Intermec had to get the . . . But how can you resolve the unjust enrichment claim without looking to the contract? No, I think you always . . . The only way you determine whether or not any money is owed here is try to wrestle with these two clauses that you just spent half your argument explaining to us. And that seems to me to be doing exactly . . . I'm looking at the language . . . What's the . . . I mean, it's a question. Sorry, Your Honor. I'm looking at the language specifically of the Second Circuit's decision in mid-Hudson Catskill v. Fine Host Corporation, which basically says that, in that case, they were seeking a claim under the related cousin of Quantum Berowit, but it still looked to the contract in order to determine whether or not there was a claim, an equitable claim there, and said you can't do that under New York. Your Honor, all of the New York cases that allow unjust enrichment or allow it to go to the jury, they all define that something is not covered by the contract. For example, ownership of a certain group of cars, in a fleet of cars, was just not . . . The contract was silent about it. In this case, the contract is silent about . . . The contracts were silent about whether Intermec could be repaid if there was, at the end of the contract, an overpayment of royalties. The contract doesn't say anything. It doesn't provide for . . . It provides for IBM to maybe get money. Without going back to the terms of the contract, how could a jury determine the stand-alone equitable claim? Because you always . . . It's not like somebody who builds a house on an oral agreement and the homeowner refuses to pay, and then the contractor comes in and says, Well, the reasonable hourly value of my services as a contractor is X, and I put this number of hours, and here's the material bill, and I get a quantum merit recovery. Your Honor, we've cited in our brief many cases in which the court determines that the contract . . . You have to always go to the contract first to find out whether the contract covers the issue in dispute. Did it cover it? And if it doesn't cover it, and if you meet the other elements of unjust enrichment, you can recover on unjust enrichment. But you always have to start at the contract. What I see here, I frankly agree with the last statement you made, but it seems to me that there was a level of complexity that needn't have arisen. Maybe I'm too simplistic, but look, if you read 10.3.1 as unambiguous, then Intermec did not overpay, and IBM wins. But if 10.3.1 is ambiguous or should be read in light of your interpretation of 10.2.1, then you have a problem with 10.3.1 and Intermec overpaid, and you go to the jury on the amount of damages on the contract and maybe enter a summary judgment on the contractual interpretation. But to say both provisions are unambiguous and there's an unjust enrichment claim that should go to the jury, then I completely agree with Judge Tolman that doesn't make any sense under New York law, right? No, because the jury wasn't considering whether Intermec had, the determination had already been made by the court that Intermec should have paid under 10.2.1. Right. And that just, all that does is fix the amount of money that the court, that the jury would consider that IBM was unjustly enriched by. So you're just going back to the contract. I mean, forgive me for interrupting. I think that takes care of the statute of limitations as well. Your suit was filed, as I understand it, January of 2011, and if you're going under a theory where 10.2.1 is unambiguous and accounts for payments that were made up until, I believe, 12, there's no statute of limitations problem. But if the last payment under 10.3.1 was made in 2010, you're out of time. But it doesn't matter because 10.3.1 governs and there's no ambiguity that would allow for any recovery because you didn't overpay. So it seems to me we've just got to decide which of these two provisions is unambiguous and applies. Maybe I'm wrong, but you let me know if I am. I guess I would answer your question this way. I would answer it this way. The repayment of any overpaid, in other words, of any overpaid royalties was simply there's no contract provision in this, and this is very akin to the cases in New York where they find that whatever the dispute is between the parties, yes, their relationship started out of a contract. But the specific dispute in this case, IBM's unjustly enriched by not returning an overpayment, that if the contract doesn't cover that, and by that they mean it didn't cover what to do in the case of an overpayment, then you get to assert in the alternative unjust enrichment. The jury was properly instructed on this regard. The jury came back with an unjust enrichment judgment. They had been instructed that, in any event, that it was 10.2.1 that applied. So the jury wasn't making that consideration. So I would really urge quickly, the cases are uniform, I think, in New York, that if you don't, if it's not covered specifically by the contract, the issue and dispute, and here are the issue and dispute, overpaid royalty, payment back of overpaid royalties is not in that contract. That's exactly the position taken below, and I believe that that means that the unjust enrichment would lie. And on statute of limitations, I think there are two points. One is, I think the court below properly found, that because this was a running, these were running events, in other words, every quarter you're collecting reports from your licensees, you're figuring out what you owe IBM, you're sending IBM off the money, and you don't know until the end of the contract, and you've also got this credit, by the way, being applied from the 2002 agreement, you don't know until the end of the contract, whether you actually owe IBM money, or IBM owes you money. You just don't know. Because you never know until the end, and that last quarter gets reported, what's going to happen. And I believe that's why the court below properly decided that the statute of limitations couldn't run, start running until the end of the contract, because it's the wrongful act, New York law is uniform, it's the wrongful act of the defendant that triggers the, it's not the payment of some money, necessarily, it's the wrongful act of the defendant that triggers the cause of action. And it's here, when you finally know that IBM owes Intermec money, and IBM says we're not paying, right, so it's either when you know, when that last calculation was done, that's the earliest point at which I think a cause of action could arise here. I've let you run four minutes over your time. I know. Well, thank you very much, I just didn't want to leave the. I appreciate it, and that's why I let you run on a little more. But let's hear from Mr. Tondini. Thank you. Thank you. Just if I could respond to several of the points raised. First, as a matter of the contract, there is no reconciliation provision in this contract. And this is an important point, not just for the time bar, but for others as well, but particularly for the time bar. This is not an agreement where, oh, at the end, in 2008, which is when the agreement ended, in 2008, we'll true up the accounts. You will not find that anywhere in the agreement. Wasn't there a final accounting due at the end of April 2008? That was when the final payment was due, and if there was an underpayment to the minimums in 10.3.1, then Intermec would have to pay more. But you will look and look and look, and there is not a provision in here that says that IBM will check its accounts too and make a reimbursement. And this is an important point because, and this goes to Judge Tolman's thing about the subject matter of the contract and claims and equity. IBM bargained for and bargained with Intermec on the payment provision, and Intermec got the right to self-report on these rapid starts, to self-calculate where they fell, to self-calculate the amount due, and to make a payment. But IBM also required that Intermec have an officer of Intermec certify that these payments we are making, the classification we are doing of these licenses, where we're putting them, I certify as an officer of Intermec it is true and correct. That's in 10.4.1 of the contract. Why is it there? So that IBM can then take the money in from the wire transfer and send it off to Yorktown Heights so that more research can be done by IBM. They don't have to hold it in escrow waiting for maybe someday Intermec to change its mind about where they categorized. So you say the final accounting is a one-way item. It's only checking whether IBM has been paid up to 10.3.1 levels. Yes, and I would urge the court to go through and look at 10.4. All of the provisions in there that run in favor of an accounting, if there's going to be an audit, it's IBM's right to audit the self-report. They get the privilege to self-report and pay. They exercised it. They don't get to come back. That's the subject matter that would bar the equitable claim. Would you address Ms. Beech's point that the sales under Rapid Start included patents that were not IBM patents, applications which were not IBM patents, and therefore were not the sale of Bayer patent licenses? I will address that. The Rapid Start agreements were Bayer patent licenses under 10.3.1. They included IBM patents and IBM patent applications. And if you look at the definition of capital P patents in the agreement, it includes IBM patents and IBM patent applications. Those Rapid Starts also, I want to be very clear and honest with you, they did also include Intermec patents. They did also include Intermec patent applications, and that's irrelevant to 10.3.1. The only thing that's relevant to what IBM gets paid is what is it of IBMs that you transfer. So you mean the language copyright materials, knowledge, or mask works, which is associated with any consulting or assistant to be IBM matters? Up into consulting and assistance. Anything of those would be IBM. Consulting and assistance would be rendering something that Intermec did. And I want to draw it because we have very concrete examples of this. But there has to be some, in your view, there has to be something additional to a Bayer patent of IBM's property consisting of copyrightable material, knowledge, or mask works that may be used in association with consulting by Intermec. But if there is no assignment of IBM copyrightable know-how or mask works, then it is not a 10.2.1 or 10.2.3 matter. It's a 10.3.1 matter. Precisely. Thank you. Okay. And the argument that they make, which is, oh, Intermec patents equal assistance, I think is unreasonable to believe that these parties would use the word assistance when they could readily use the word patents. That's not it. There was a license agreement that Intermec licensed prior to the rapid starts that included technical assistance. It included know-how. And that was to transcore. And that was treated as a 10.3.2 because it was patents plus. And then because it's 10.3.2, you borrow the 10.2.1 payment scheme. And that transcore license is in the record at ER 658. And you'll see in there very specifically it has a patent grant and then a grant to know-how and then a provision for, here's how we'll provide you technical assistance and consulting and a payment scheme for that. And that's very different than the grants in the rapid starts, which is a patent grant. And I would say in regard to the kind of license that Mr. Veach says would fall into 10.3.1, which would be like a license to Walmart for using a system, that doesn't make any sense contextually because 10.3.1 says that if you settle a patent infringement case with somebody, then that's a sub-exception to 10.3.1. Well, that doesn't make sense for the Walmart example. Suing another product manufacturer makes sense, and so products are in 10.3.1. When you dedicate a patent to the public in terms of standard setting, well, that doesn't make sense with the Walmart example, but it does make sense if a bunch of product manufacturers are setting a standard and Intermec dedicates a formerly IBM patent to the standard and says, okay, everyone making a product that uses this, now we can use that. So contextually, that makes sense as well. And it appears I've expired my time, but if there's more questions. Unless the panel has any further questions. I just want to thank all of you. The argument was really helpful and as good as the briefing.  We will take the matter under review.
judges: Murphy, Tallman, Bea